Filed 8/10/15  P. v. Virto CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>AGUSTIN BERNARDO VIRTO et al.,<br><br>     Defendants and Appellants. | B243201<br><br>(Los Angeles County<br>Super. Ct. No. TA118561) |

APPEAL from judgments of the Superior Court for the County of Los Angeles. Laura R. Walton, Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant Agustin Bernardo Virto.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant Edwin Zamora.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Rodrigo Sandoval.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Pedro Antonio Sierra.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, and Jonathan J. Kline and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**SUMMARY**

Four defendants – Agustin Bernardo Virto, Edwin Zamora, Rodrigo Sandoval and Pedro Antonio Sierra – appeal from attempted murder convictions with gang and other enhancements, asserting multiple claims of error. Defendants, who join in each other's arguments, assert error in the trial court's refusal to grant a mistrial based on the prosecutor's failures to provide timely discovery; instructional error on aiding and abetting (and error in the trial court's response to a jury question on that topic); insufficient evidence of aiding and abetting; insufficient evidence of intent to kill and premeditation in the attempted murders; and error in failing to instruct on attempted involuntary manslaughter and assault.

Defendants also contend the gang expert was not qualified to testify as an expert; photographs depicting their gang should not have been admitted in evidence; and the gang expert should have been required to disclose the identity of gang members with whom the expert spoke about the benefit of the crimes to the gang.

Defendants contend there was error in the admission of evidence that they admitted gang membership while being booked for these crimes.

Defendant Sandoval contends the trial court erred in denying his motion for severance. He and defendant Zamora, who were under age 18 at the time of the offenses, contend their sentences violate constitutional prohibitions on cruel and unusual punishment. Defendants also claim error in the amount of the restitution fines imposed, and cumulative error.

With two exceptions, we find no error. First, the trial court was required as a matter of law to grant Mr. Sandoval's motion for severance, but the error was harmless. Second, our Supreme Court has held that admissions of gang membership, elicited during routine booking procedures without *Miranda* [1] warnings, may not be admitted in evidence during the prosecution's case in chief, so the trial court erred in doing so. The

---

[1] *Miranda v. Arizona* (1996) 384 U.S. 436 (*Miranda*).

error, however, was harmless beyond a reasonable doubt. Accordingly, we affirm the judgments.

## FACTS

**1. The Crimes**

This case involves two separate incidents, one a stabbing and the other a shooting, in which various defendants, all alleged to be members of the Compton Varrio Segundo (CVS) gang, attacked two different victims, each believed to be associated with other gangs. Defendants Virto and Sandoval were involved in the shooting, and defendants Zamora and Sierra were involved in both incidents.[2]

**a. The June 5, 2011 stabbing of Andres Perez**

On June 5, 2011, Andres Perez was walking with a friend to a liquor store near his home in Paramount when a black Hyundai pulled over. Mr. Perez had been living in the area for only a month or two, and had seen the black Hyundai before, just after he moved to Paramount. There were four people in the car. Someone in the car asked "where I was from or 'What does your tattoos say?' " (Mr. Perez had visible tattoos on his arms saying "Krooks" and "Town." He later testified he used to be part of the Krookstown tagging crew from Compton.) Mr. Perez felt "nervous and scared," but "just kept on ignoring them," because "I'm not into that no more." It took him about 15 minutes to walk home. He went inside for about five minutes to get a basketball, and then walked toward a nearby park.

As he was walking to the park, the black Hyundai "pulled over again and asked me the same question, where I was from. And I kept on ignoring them." Mr. Perez heard voices inside the car say, "This is Segundos" and "Fuck Sans Street" and "Get out of my hood." Then, the driver told "those guys in the back" to "come out and get me." By this time, Mr. Perez's friend had left and he was alone. "So they came towards me. One of

---

**2** A fifth defendant, Noe Favela Salazar, was charged and tried in the stabbing incident, but the jury did not reach a verdict in his case. Mr. Salazar and three others were also charged with conspiring to dissuade witnesses from testifying, but those charges were tried separately for security reasons.

them [later identified as Mr. Zamora], came towards me and pulled me back while I was running back home trying to get away."

"He pulled me back, and we started fighting. And some other guy [(later identified as Mr. Sierra)] came out, the other guy from the other back came out. And the guy that pulled me back [(Mr. Zamora)] was trying to stab me in my neck. While I was trying to get rid of him, the other guy [(Mr. Sierra)] came and stabbed me in the side." One of the attackers said, "Fuck you. I hope you die." Mr. Perez ran toward his house and collapsed, telling several people there he had been stabbed by Segundos. He was taken to a hospital where he had surgery and remained for nine days.

An 11-year-old girl witnessed part of the incident. She saw two boys "beating up another boy." She said: "They were beating him up. And then they were kicking him in the face, and one told him a bad word," which was "bitch." "They told him that he was going to remember this, bitch." One of them had something black in his hand. "They just kept hitting him, and then the guy tried to push them away, but they didn't let him. And then they ran in the car, and there was a person in the front that was driving them." The car was black. "And then the guy, he just was walking to his house and he was bleeding and he spit [blood] in front of my yard."

Deputy Leticia Reyes followed Mr. Perez to the hospital and talked to him in the recovery room after his surgery. Mr. Perez was heavily sedated and in and out of consciousness, but "he did talk to me a little bit." When she asked him who stabbed him, he "said he couldn't remember who they were . . . but he knew they were from CVS." "He said he couldn't – at that time he couldn't tell me exactly who they were. But he knew that if he could see, like, a picture of them, he would be able to see them or identify them at a later time." Mr. Perez later testified that he told Deputy Reyes that he "could not identify" the person at that time, and he told her that "[b]ecause I was unconscious and I couldn't, like – I couldn't remember nothing. Everything just went blank on me." Mr. Perez also told Deputy Reyes that "he did not see the weapon used in the incident and that he did not know if he had been stabbed or shot."

4

On June 7, 2011, two days after the stabbing, Detective Kasey Woodruff interviewed Mr. Perez at the hospital and showed him two "six-packs" of photos. Mr. Perez immediately identified Mr. Salazar from the first six-pack as "one of the guys" involved in the stabbing. On a second six-pack, Mr. Perez noted that three of the individuals in the photos (one of whom was Mr. Sierra) looked "familiar."

On June 13, 2011, Detective Woodruff brought additional six-packs of photos to show Mr. Perez. One of them contained Mr. Zamora's photo, and Mr. Perez picked out Mr. Zamora's photo "[f]airly quickly," as the person who "was stabbing at [his] neck," the "first one that came out . . . ." One of the six-packs contained an updated photo of Mr. Sierra. Mr. Perez again said Mr. Sierra "looked familiar, but . . . he was not sure." (At the trial, Mr. Perez identified Mr. Sierra as the person who stabbed him in the side. He was certain, "[b]ecause he was just right in my face." The other six-packs contained photos of defendants Virto and Sandoval, who were not charged in the stabbing and whom Mr. Perez did not recognize.)

Two days later, Detective Woodruff showed Mr. Perez photos of a black Hyundai and a knife that had been recovered from the black Hyundai, and Mr. Perez identified them as being the car and knife used in the stabbing. No fingerprints were found on the knife. The registered owner of the black Hyundai was Mr. Sierra's mother.

**b.      The June 12, 2011 shooting of Raul Magallanes**

Raul Magallanes was at the corner of San Vincente Street and Orange, in Paramount, in the late afternoon of June 12, 2011, when a black Hyundai with four people in it approached and stopped. One of the four, later identified as defendant Sandoval, got out of the rear seat on the passenger side, and approached Mr. Magallanes with a firearm. Mr. Magallanes "turned around and I ran." The person shot at Mr. Magallanes three times, but Mr. Magallanes "dodged it" by "running through cars, running through the streets, through parked cars." The person with the gun ran after him, and the car "kept going straight." The assailant was wearing a black hat with an "S" on it and a gray T-shirt.

Mr. Magallanes ran from the corner "to where my grandmother stays at to the next house where I was staying at." The shooter stopped following him when he ran into his backyard. Mr. Magallanes saw the shooter run by his neighbor's house, where about eight people were gathered in front of the house. Mr. Magallanes waited in the backyard for five or ten minutes "until the coast was clear," and then went to the front.

Olivia Magallanes, the victim's sister, was outside talking to neighbors when the shooting occurred. She saw her brother walking down Orange, saw the black car approach and saw the shooter get out. The shooter chased her brother with the gun. Her brother "started running down San Vincente and ran to the side of [her] house." The shooter ran past her, and after he passed, Ms. Magallanes called 911. (Ms. Magallanes later testified that she noticed the black car because "they always harass my brother" and "always hit him up," meaning "[p]rovoking a fight." By "they," she meant defendants Salazar, Sandoval and Zamora. She had seen them "hit up" her brother, in front of her home, "a couple of months before the shooting," and they were always in the same black car as on the night of the shooting. (Defendant Sandoval, however, had been incarcerated from October 5, 2010, until two days before the Magallanes shooting.)

When Deputy Paul Klinefelter arrived after the shooting, Mr. Magallanes told him that a rear passenger got out of the black car and "yelled out, 'Fuck you,' and withdrew a black revolver from his waistband and shot at him approximately four to five times." The victim "recognized that car from a previous incident that he did not report that happened two to three weeks prior." Mr. Magallanes told Deputy Klinefelter that "the same car and the same people inside the car shot at him previously." (Mr. Magallanes later testified he used to associate with the Sans Street gang, a rival of CVS, and he had been a member of 155, a gang in Compton.)

Deputy Ted Gomez participated in a search of the area where the shooting occurred. He found a gray T-shirt and a black or dark-colored cap "almost underneath some shrubbery," in back of a house on San Mateo. There was a firearm underneath the shirt, "within the fold of the T-shirt." The firearm was a Smith & Wesson revolver, later found to have three expended casings and two live rounds.

6

The police found defendant Sandoval hiding underneath a truck in the driveway of another home on San Mateo Street, and took him into custody. Deputy Reyes did a gunshot residue examination of Mr. Sandoval's hands and booked the sample into evidence.

Deputy Joel Andrade was driving in the vicinity of the crime scene and saw the black Hyundai. He followed it and stopped it as it entered the city of Compton. He took defendants Sierra (the driver), Virto (the front seat passenger) and Zamora (the rear passenger) into custody, and placed them in his patrol car.

Deputy Klinefelter took Mr. Magallanes to the place where Deputy Andrade was holding defendants. As they pulled up, Mr. Magallanes saw the black car and said, "That's the vehicle. That's it. That's the right one." (He later testified that he had been approached by the same car five or six times in the past.)

Then, the deputies brought the suspects out, one at a time. Mr. Magallanes identified Mr. Virto right away, saying "That's the guy in the front seat." He also identified Mr. Sierra immediately, saying that he was the driver, and similarly identified Mr. Zamora, saying that he "was the other guy in the back seat." (At trial, Mr. Magallanes no longer remembered who he identified on the day of the shooting.)

Deputy Klinefelter then took Mr. Magallanes to the place where defendant Sandoval was detained, and Mr. Magallanes identified Mr. Sandoval, who was no longer wearing the gray T-shirt and black cap, as the shooter. Mr. Magallanes also told Detective Klinefelter that Mr. Sandoval "was the same person a few weeks prior that was involved in the shooting." (As indicated above, Mr. Sandoval was incarcerated at that time.)

Deputy Sergio Cosio talked to Olivia Magallanes at the crime scene. She told him she had heard three to four shots. Deputy Cosio drove Ms. Magallanes in his patrol car to two field show-ups. At the first, she identified Mr. Virto as the front passenger in the black Hyundai, which she also identified. At the second show up, Ms. Magallanes identified Mr. Sandoval as the shooter. (At the trial, Ms. Magallanes did not remember ever identifying Mr. Virto.)

7

During the booking process, Mr. Sierra admitted he was a member of the CVS gang, and Deputy Andrade recorded that on the booking sheet. Mr. Virto did not admit he was from a gang, but admitted that he associated with the CVS gang, and Deputy Andrade's partner recorded that on his booking sheet. Mr. Virto denied having a moniker. Mr. Virto had several CVS tattoos on the back of his head. Mr. Zamora said he was affiliated with CVS and his moniker was Darky. When he was booked, Mr. Sandoval told Deputy Reyes he was a member of the CVS gang. He had several tattoos, including "Segundo" on his right leg and "Compton" on his left leg.

Defendants Virto, Sierra, Sandoval and Zamora were charged with the attempted willful, deliberate and premeditated murder of Raul Magallanes. The information also contained firearm use and discharge allegations, and alleged defendants Sandoval and Zamora were minors at the time of the offense.

Defendants Sierra, Zamora and Salazar were charged with the attempted willful, deliberate and premeditated murder of Andres Perez. The information alleged defendant Zamora was a minor; defendants Zamora and Sierra personally used a deadly weapon (a knife); and the three defendants personally inflicted great bodily injury upon the victim.

The information also alleged both offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang.

## 2. Other Evidence Presented at Trial

Mr. Magallanes testified that about four weeks after the shooting, someone from the Segundos approached him "to find out who was coming to court." The person told Mr. Magallanes "the little homies were just running amuck, out there being active." The person said "to figure stuff out and try not – for them not to come to court." The person said "he would pay money for people not to come to court." The person also approached Mr. Magallanes's father. The person's name was Joshua and the Segundos called him "Sniper."

Detective Liliana Jara, who was an investigating officer in the Magallanes shooting, also testified as a gang expert. Based on hypotheticals mirroring the facts of the crimes charged, she opined that the Perez stabbing was committed for the benefit of,

8

at the direction of, and in association with the CVS gang, and that the Magallanes shooting was committed for the benefit of and in association with the CVS gang.

Other evidence will be described in our discussion as necessary in connection with the claims on appeal.

### 3. The Discovery Violations

The prosecution was continually late in turning over discovery. The trial court denied a mistrial motion, but ordered continuances and held compliance and sanctions hearings in an effort to ensure the defense could adequately prepare. The chronology is this.

### Thursday, March 22, 2012

A jury panel was sworn on March 22, 2012, and ordered to return for jury selection on Monday, March 26. The court reviewed the status of ongoing issues relating to recorded jailhouse conversations, in connection with alleged attempts to dissuade witnesses from testifying. Despite previous court orders for transcription of tapes by a Spanish translator by March 14, a tape with six hours of conversations was not turned over by the prosecutor until March 20. Notwithstanding that, defense counsel announced ready for trial; counsel did not request a continuance or exclusion. To the contrary, Mr. Virto's counsel "object[ed] to any continuance just for the record."

Defense counsel said they were "still missing numerous items with regard to discovery," including rap sheets of the victims; photographs of items from the crime scene; and "any F.I.'s [(field identification cards)] they intend to use which relate to their proof of the fact that their victims are gang members . . . ." As to the rap sheets, the prosecutor said, "I ran them all and there's nothing to turn over." The prosecutor said she had provided all counsel with "a list of all the discovery that I have" on October 17, 2011, and this was "the first I have heard that anyone is missing the photos" of items from the crime scene. She also said this was the first time anyone had requested "victim F.I.'s," and undertook to check with her investigator before Monday, March 26 to see if any existed. (Counsel for Mr. Virto later acknowledged she received victim F.I. cards on March 29.)

9

**Monday, March 26, 2012**

Counsel for defendant Zamora stated he received late discovery involving some DNA results from the knife alleged to have been used in the Perez stabbing. The results were inconclusive, and the prosecutor had not decided whether to introduce that DNA evidence. Counsel asked for a continuance to have the DNA retested, or a sanction excluding the DNA evidence. The court ordered the prosecutor to comply, by Wednesday morning, March 28, with five discovery requests that would assist the defense's laboratory in determining whether to retest the DNA. The court denied Mr. Zamora's request for a continuance. Mr. Zamora's counsel acknowledged the court had "proposed a reasonable alternative to sanctions," in that if the defense laboratory needed additional time to retest, "the court will go dark on those days . . . ."

One of defense counsel stated that "there are, apparently, as of today, F.I.'s that we need to receive." The court set April 5, 2012, for discovery compliance. Trial was set to begin on April 9. That date for the start of trial had been decided in February, to accommodate the schedules of defense counsel.

**Tuesday, March 27, 2012**

Mr. Sandoval's counsel stated he had never gotten a gunshot residue report. The prosecutor had recently discovered she had no report and the testing had not been completed. Mr. Sandoval's counsel said that, "[a]s long as I get it by the end of this week, that's fine."

**Wednesday, March 28, 2012**

Jury selection was completed on March 28, and the court ordered the jury to return on Monday, April 9 for the beginning of trial.

The court set Monday, April 2, 2012, as the discovery compliance deadline for the gunshot residue report. The prosecutor was "continuing to work" on the DNA-related discovery requests for information needed by the defense's laboratory; the court ordered the information to be ready no later than 4:00 p.m. the next day, March 29, absent which there would be a hearing on April 2, 2012, on sanctions for failure to comply with discovery. (The prosecutor apparently complied with the court's order, as there was no

10

hearing on April 2 and no further complaint by defense counsel on the DNA or gunshot residue items.)

### Tuesday, April 10, 2012

On April 10, 2012, counsel for Mr. Zamora complained that he had not received a copy of a fingerprint report on the knife. Other defense counsel could not remember whether they had received the report. (The report showed no prints were developed on the knife.) The prosecutor said she turned over the report last year, and asked for a hearing later in the day to present her proof that she had turned everything over. The court stated it would have the hearing at 3:00 p.m. the following day so the prosecutor could present her proof, but Mr. Zamora's counsel was ill that day and the hearing did not occur.

### Wednesday, April 11, 2012

The court announced that court would not be in session from Wednesday, April 11 (because of the illness of defense counsel) through and including Monday, April 16 (because of two funerals of victim Raul Magallanes's family members).

Defense counsel for Mr. Sandoval reported that the prosecutor had emailed him two tapes the day before, of interviews with victim Raul Magallanes and his sister, Olivia. The tapes had been in existence since June 13, 2011. The tape of Raul Magallanes included a statement he had been convicted of a felony in Orange County. Defense counsel did not know Mr. Magallanes had a rap sheet, which defense counsel had previously requested.

The prosecutor said she received the recordings the previous day from Detective Jara; there had been a miscommunication with Detective Jara, who thought the prosecutor already had them. The prosecutor turned them over immediately, and also sent them out to be transcribed. The court ordered the prosecutor to turn over transcriptions to the defense by Friday, April 13, at 3:00 p.m. Counsel for Mr. Zamora later confirmed he was provided with transcripts of the two Magallanes interviews on Friday, April 13.

11

As for the rap sheet, the prosecutor reaffirmed the CLETS printout showed no convictions. The following day, under cross-examination by Mr. Sandoval's counsel, Mr. Magallanes admitted that he had been arrested and convicted of a grand theft auto in Orange County five years before. When counsel then asked about other convictions, the court held a sidebar. The prosecutor showed the court a CLETS printout dated March 21, 2012, which did not show any convictions, and said that "Detective Jara also ran him and she said she didn't find anything." The court called Mr. Magallanes to the sidebar, and he told the court his only other conviction was for being under the influence of methamphetamine. There was no further controversy about the rap sheet.

**Tuesday, April 17, 2012**

On Tuesday, April 17, 2012, at a recess during victim Raul Magallanes's cross-examination, the prosecutor told the court that Detective Jara had just told her during a break that "there are recorded interviews of Olivia and Raul [Magallanes] regarding the witness intimidation by Joshua Garcia. I didn't know that these recordings existed until now. Detective Jara thought she had given them to me."

The court ordered the prosecutor to turn over the interviews at the end of the day, and scheduled a hearing for 9:00 a.m. the following morning to consider the defense request for discovery sanctions. The court said it would not excuse Mr. Magallanes as a witness, so the defense could cross-examine him based on the tapes, and that the court would give a late discovery instruction, "not just concerning this, but the other discovery . . . concerning Mr. Magallanes's initial interview so that the jurors will know. And there is a jury instruction that I plan to notify the jury of that."

At the end of the April 17 session, the prosecutor said that she had gone over with Detective Jara "right now all of the recordings that exist in the case, and there is nothing else. Everything else has been turned over."

**Wednesday, April 18, 2012**

The court held a lengthy hearing on the defense motion for sanctions for the late disclosure of the recordings of the three interviews of Olivia and Raul Magallanes. The

12

recordings were 35 to 40 minutes in length, and the interviews had occurred in September 2011.

Defense counsel summarized the recordings for the court. The recordings were pertinent to the prosecution's evidence that another gang member known as "Sniper" had tried to dissuade witnesses from testifying to the crimes against Mr. Magallanes. One of the recordings revealed that Raul Magallanes knew Sniper (defendant Joshua Garcia, who was tried separately) and "became sort of friendly with Sniper" when they were in county jail together, so Magallanes had "mixed feelings," and "wasn't really that taken [aback]" by Sniper's actions in allegedly attempting to dissuade witnesses from testifying.

The defense moved for a mistrial. The court denied the motion, saying in pertinent part: "The dissuading count is not part of this case. . . . [¶] . . . [¶] [T]he additional turned over recordings yesterday [do] not go to the underlying charge . . . which is the attempt[ed] murder. It only goes to . . . whether or not Mr. Magallanes was in any way dissuaded or felt pressured by another individual approaching his family members. But it does not go to the underlying charges of this case." "It basically goes to your ability to attack the credibility . . . of the witness, who is still available, who's still on cross-examination, and the tape recordings are only 35 to 40 minutes."

Counsel agreed that a week's continuance would be adequate. The court granted a continuance until Monday, April 23, 2012, saying: "The Court is ordering the People to prepare transcripts of the three additional tape recordings of Victim Magallanes and his sister, Olivia Magallanes, and have them to all defense counsel by 3:00 p.m. . . . Friday, April 20th . . . ."

### Monday, April 23, 2012

Mr. Magallanes's cross-examination continued on April 23. On redirect, the prosecutor elicited testimony that, between the previous week and April 23, Mr. Magallanes had been relocated.

At the next recess, the court inquired about Mr. Magallanes's relocation and whether the defense had been informed. They had not. Detective Jara told the court she applied for the witness relocation on Thursday of the previous week (April 19) because

Mr. Magallanes told her "he was afraid and he wanted to be moved." The defense objected they had not been told of his relocation, and the court agreed the defense should have been informed before Mr. Magallanes took the stand that morning.

The defense again moved for a mistrial. The motion was denied.

**Wednesday, April 25, 2012**

On redirect examination, Olivia Magallanes testified that she had seen the black Hyundai in the past, "when they tagged on my house," but did not see who was in it. She said she thought there was a police report on that day. (This occurred on January 22, 2011, before the shooting incident.) At the noon recess, defense counsel asked for the police report Ms. Magallanes mentioned, saying "we need to know whether she identified anyone and whom at that time." The court asked Detective Jara to obtain any police reports on the incident. The prosecution turned over the report during the recess. The prosecutor also observed that "everything mentioned by Ms. Magallanes regarding the vandalism is also part of her recorded interview from June 13th, and all counsel have that interview and the transcripts."

**Tuesday, May 1, 2012**

On April 23, 2012, the prosecutor had emailed a three-minute YouTube video to defense counsel. The video was "all about Compton Varrio Segundos," with photos of monikers of the defendants and tagging; the video named the gang's rivals and was "full of their symbols." The video was uploaded in 2009; the prosecutor said that "the comments on the video were as recent as . . . about two weeks ago." The prosecutor's April 23 email said that Detective Jara "found this video on You Tube over the weekend."

On May 1, 2012, the defense objected to use of the video. The court refused to allow the prosecutor to show the video but allowed the prosecution to use certain still photographs taken from the videos, depicting CVS gang symbols and the like, finding them relevant to corroborate Detective Jara's expertise.

14

The court later instructed the jury on the prosecution's late disclosure of the recordings of the June 13, 2011 and September 7, 2011 interviews with Raul and Olivia Magallanes, as quoted in the margin.[3]

## 4.    The Verdicts and Sentencing

The jury convicted defendants Virto, Sandoval, Zamora and Sierra of attempted willful, deliberate, and premeditated murder in the Magallanes shooting. The jury found true the allegations that Mr. Sandoval personally and intentionally used and discharged a firearm, and, with respect to defendants Virto, Zamora and Sierra, that a principal did so.

In the Perez stabbing, the jury convicted defendant Zamora of attempted murder, and convicted defendant Sierra of attempted willful, deliberate and premeditated murder. The jury found true the allegations defendants Zamora and Sierra personally used a deadly weapon, a knife, and also that defendant Sierra personally inflicted great bodily injury on the victim.

The gang allegations were found true as to both crimes.

Defendants Sandoval and Zamora filed motions for a new trial, based in part on the prosecution's discovery violations. In denying Mr. Zamora's motion, the trial court observed: "[T]he court had an opportunity to listen to the recordings, to review the transcript of the recordings. And it is the court's interpretation that the recordings, although they were turned over late, were, 1, in no way exculpatory in this case, and 2, did not amount even to significant impeachment of the witnesses in this case." And: "The court is certain that with the experience and expertise of the defense attorneys, if they felt the recordings . . . were in any way exculpatory or amounted to significant

---

[3]    "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose: the recordings of interviews of Raul Magallanes and Olivia Magallanes from June 13, 2011 and September 7, 2011 within the legal time period. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

15

impeachment of the witnesses, they would have brought that out during their questioning on cross examination."

The court also addressed Mr. Zamora's complaint about late discovery of the police report on the January 22, 2011 vandalism at Olivia Magallanes's home. The court noted that the police report showed Ms. Magallanes did not indicate she was able to identify the individuals and her description of the car "was not even that great of a description . . . ." The court said the defense had a full opportunity to cross-examine Ms. Magallanes "on the car's description, on her ability to identify any of the individuals at the time she gave the vandalism reports to the police officers. [¶] . . . [N]or did the defense request additional time after they received the police reports to conduct their investigation."

The court sentenced defendant Virto to life in prison with a minimum term of 15 years, plus 20 years consecutive, and likewise sentenced defendant Sandoval to 15 years to life, plus 20 years consecutive. The court sentenced defendant Zamora to state prison for an aggregate term of 43 years to life, and sentenced defendant Sierra to an aggregate term of 51 years to life. The court imposed restitution fines of $240 in each case, and made other orders not at issue in these appeals.

Defendants filed timely appeals that were later consolidated.

## DISCUSSION

**1.     The Discovery Violations**

Defendants contend the trial court's denial of their mistrial motions, as a sanction for the prosecutor's discovery violations, deprived them of due process of law. We find no error by the trial court.

**a.     The law**

In *People v. Verdugo* (2010) 50 Cal.4th 263 (*Verdugo*), the Supreme Court described the requirements of Penal Code section 1054.1, a part of the reciprocal-discovery statute.[4] Section 1054.1 requires the prosecution to disclose to the defense

---

**4**     All statutory references are to the Penal Code unless otherwise specified.

16

various categories of evidence " ' "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' [Citation.]" (*Verdugo*, at pp. 279-280.) Evidence subject to disclosure includes statements of defendants, real evidence obtained as part of the investigation of the offenses charged, written or recorded statements of witnesses, and so on. (*Id.* at p. 280.) " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. [Citation.]' [Citation.]" (*Ibid.*)

If the prosecutor has not complied with section 1054.1 (and the defense has complied with informal discovery procedures), the trial court "may make any order necessary to enforce the provisions" of the statute, "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).) In addition, the court may "advise the jury of any failure or refusal to disclose and of any untimely disclosure." (*Ibid.*) "A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. [Citation.]" (*Verdugo, supra,* 50 Cal.4th at p. 280.)

"We generally review a trial court's ruling on matters regarding discovery under an abuse of discretion standard. [Citation.] In particular, 'a trial court may, in the exercise of its discretion, "consider a wide range of sanctions" in response to the prosecution's violation of a discovery order.' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

**b.      This case**

Here, we find the trial court provided an adequate remedy for the late disclosure of evidence, and the defendants do not demonstrate prejudice, so there is no basis for reversal of the judgment.

We first address the late disclosure of recorded interviews with Olivia and Raul Magallanes – the two June 2011 interviews, disclosed on April 10 after opening statements, and the three September 2011 interviews, disclosed during the cross-

17

examination of Mr. Magallanes.  From these recordings, defendants found that Mr. Magallanes had a prior felony conviction, and that he and Sniper were "friends from their time in jail together, undermining Magallanes's testimony the encounter with Garcia [(Sniper)] made him fear for his family's safety."

Defendants each generally argue the failure to timely disclose those interviews deprived them of sufficient time to investigate, and they could not effectively cross-examine witnesses because of the late disclosure.  Notably, none of their contentions is anything more than a generality, not a demonstration of prejudice.  None of defendants explains why the trial court's remedies for the violations were inadequate.  The defense had five days to consider its tactics after it learned of Raul Magallanes's felony conviction.  As for the September 2011 recordings not disclosed until Mr. Magallanes was already being cross-examined on Tuesday, April 17, defendants do not explain why the continuance the court ordered – to Monday, April 23 – was inadequate for their investigation and preparation for further cross-examination.

As *Verdugo* tells us, "generalized statements are insufficient to demonstrate prejudice."  (*Verdugo, supra,* 50 Cal.4th at p. 282; *id.* at pp. 281-282 [defendant asserted without elaboration that he " 'could not properly or effectively prepare for cross-examination of witnesses,' that 'his ability to impeach the witness[] was adversely impacted,' and that '[t]imely disclosure of the information would have enabled counsel to adjust his theory of the case to fit the facts"; defendant "does not explain what counsel would have done differently if the notes had been disclosed sooner"].)  The same is true here.

Defendants cite other instances of late disclosure of evidence:  the DNA evidence (which was inconclusive); the gunshot residue evidence (which was thoroughly discussed by experts on both sides); the fingerprint report on the knife (there were no fingerprints); F.I. cards showing the victims were gang members (received by the defense 10 days before testimony began); a comment by Detective Jara in one of the late-disclosed Magallanes interviews that she intended to check the crime scene area for bullet strikes (a point on which she was cross-examined extensively); the relocation of Raul Magallanes a

18

few days before his testimony; still photographs from a YouTube video of the CVS gang (which the prosecution discovered online during the trial); and a police report on vandalism at the Magallanes home that occurred several months before the crimes.

Of these, the last mentioned is the only one as to which defendants even attempt to show prejudice, and they do not succeed. Defendant Zamora complains the police report showed Olivia Magallanes did not identify anyone in connection with the pre-crime vandalism, and yet she identified Mr. Zamora in court on April 24 as one of those who were "always harass[ing] my brother." Mr. Zamora asserts this identification "surprised" the defense, and if counsel had known that Olivia Magallanes might be able to identify Mr. Zamora, "he would have investigated the vandalism incident and found witnesses to show that [Mr. Zamora] was not involved in it." But Ms. Magallanes expressly testified she did not see who was in the black Hyundai when they tagged her house, the police report likewise showed she did not identify anyone in that incident, and Ms. Magallanes discussed the vandalism incident in the recorded interview the defense was given on April 10 (with transcriptions on April 13). In short, contrary to Mr. Zamora's suggestion, there was no "surprise" engineered by the prosecutor and, as the trial court pointed out, the defense had a "full opportunity to cross-examine [Ms. Magallanes] on that issue . . . ."

In short, defendants have shown no prejudice, and no abuse of discretion, from the trial court's choice of remedies for the discovery violations in this case.

## 2. The Aiding and Abetting Issues

Defendants Virto, Zamora and Sierra raise several issues relating to aiding and abetting. They contend the instructions on aiding and abetting were not a proper statement of the applicable law; the trial court erred in its answer to a question from the jury on the issue; and the evidence in the Magallanes shooting was insufficient to establish aiding and abetting attempted murder.

### a. The instructions and the jury's question

During their deliberations, the jury asked this: "Can we find that a defendant aided and abetted if we only believe they facilitated a getaway?"

19

After hearing argument, the court answered the question this way: "Review evidence concerning aiding and abetting and jury instructions 400, 401 as to aiding and abetting[.] As to the necessary intent for aiding and abetting review instructions 600 and 601. If you need further clarification please let the court know."

On appeal, defendants contend the trial court erred in its answer to the jury. They assert the correct answer to the question was "no"; that "[e]ven if the pattern instructions are generally correct, they were not a proper statement of the law applicable to this case"; and that when the jury asked its question, the court had a sua sponte duty to give a supplemental instruction "to clarify that aiding and abetting must occur before or during the attempted murder, and that the duration of attempted murder ended when the shots were fired." We disagree on each point.

The legal principles are plain. Under section 1138, when the jury "desire to be informed on any point of law arising in the case, . . . the information required must be given . . . ." *People v. Beardslee* (1991) 53 Cal.3d 68 tells us that the court "has a primary duty to help the jury understand the legal principles it is asked to apply," but "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Id.* at p. 97.)

First, there is no merit in defendant Virto's contention that the initial instructions on aiding and abetting were incorrect because they impermissibly allowed jurors to find him guilty of attempted murder if they found he "only facilitated after the fact by facilitating the getaway . . . ." That simply is not so.

The crime of attempted murder was defined: "[T]he People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." The court further instructed that, to prove the defendant is guilty based on aiding and abetting the crime, the People had to prove that: "1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. *Before or*

20

*during the commission of the crime*, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." (Italics added.) Thus the instructions plainly required the jury to find that the defendants intended to aid and abet "[b]efore or during the commission of the crime."

Next, defendants assert that the jury's question "demonstrated jurors did not understand the duration of the crime of attempted murder," generating a sua sponte duty of the court "to clarify that aiding and abetting must occur before or during the attempted murder . . . ." Virto asserts the absence of this clarification freed the jury to convict "even if they concluded Virto did nothing more than facilitate the getaway." Again, we disagree.

As we have just observed, the instructions clearly defined the crime of attempted murder, and we see nothing in the jury's question that indicated any confusion on the timing or duration of the crime of attempted murder. And, defendants did not ask the trial court to explain "the duration of attempted murder in the context of aiding and abetting." There is no sua sponte duty to "clarify" an instruction that is correct in law, and indeed that expressly required the jury to assess an aider and abettor's intent "[b]efore or during the commission of the crime . . . ."

In any event, the trial court carefully considered the jury's question, and determined that it should "reiterate the instructions already given" (*People v. Beardslee, supra,* 53 Cal.3d at p. 97). This was not error. The court's answer properly remained neutral, referring the jury to the applicable instructions – which plainly required them to find intent to aid and abet the perpetrator "[b]efore or during the commission of the

21

crime" – and giving the jury the option of asking for further clarification if the court's answer did not suffice. There was no abuse of discretion here.[5]

### b. Sufficiency of the evidence

Defendant Virto contends the evidence was insufficient as a matter of law to prove he aided and abetted attempted murder.

The principles governing judicial review of a claim of insufficient evidence have been repeated many times. "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "The standard is the same under the state and federal due process clauses." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 (*Gonzales*).) "We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce fromthe evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved.' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

" 'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the

---

**5** Defendant Zamora also contends the court erred in responding to another question from the jury: "Can a fist fight be considered an object to cause serious bodily injury?" The court responded: "Review evidence for great bodily injury and review jury instruction 3160 for law on great bodily injury." On appeal, Mr. Zamora (the defendant who tried unsuccessfully to stab victim Perez) says he "asked that the jury be told that he could be held accountable only if the stabbing were a probable consequence of the fight between himself and Perez," and he "wanted instructions on intervening cause." Mr. Zamora is mistaken. While his counsel did tell the clerk, when he was advised the jury had questions, that he wanted "something about an intervening act," counsel said no more about it when he appeared telephonically before the court to discuss the answers to be given. Mr. Zamora's failure to argue or object in the trial court forfeits his claim, and in any event, it is hard to see how the jury's question – whatever it meant – had any application to defendant Zamora.

22

accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

Mr. Virto points out that " '[t]he mere presence of the accused at the scene of the crime does not alone establish that the accused was an abettor' " (*People v. Joiner* (2000) 84 Cal.App.4th 946, 967), and asserts the evidence shows only that he was present in the front passenger seat, knew a crime was being committed and did not prevent it. Mr. Zamora, who was in the back seat next to the shooter (and driver Sierra, who slowed the car to allow the shooter to get out), both make a similar argument, each claiming "[t]here was not proof that he knew the shooter would exit the car and shoot, or that he shared the shooter's intent to kill." We disagree.

Mere presence at a crime scene is not enough, but it is a factor the jury may consider along with all the other circumstances. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407 [" '[W]hile mere presence at the scene of an offense is not sufficient in itself to sustain a conviction, it is a circumstance which will tend to support a finding that an accused was a principal.' "]; *People v. Joiner, supra,* 84 Cal.App.4th at p. 967 [" 'To be an abettor the accused must have instigated or advised the commission of the crime or been present for the purpose of assisting in its commission.' "].) " ' "[C]ompanionship, and conduct before and after the offense" ' are also relevant to determining whether a defendant aided and abetted a crime." (*Miranda,* at p. 407.)

Here, there was other evidence from which a reasonable jury could have inferred defendants intended to facilitate defendant Sandoval's murderous attack on Mr. Magallanes. The evidence established that all four defendants in the black Hyundai on the evening of the shooting were CVS gang members. Testimony from Raul and Olivia Magallanes showed that CVS gang members in the past had repeatedly harassed Mr. Magallanes, who was or had been a member of a rival gang and who lived in CVS gang territory. On one of those occasions, CVS gang members shot at Mr. Magallanes. On that occasion, the gang members were in the same black Hyundai, and

23

Mr. Magallanes said he had been approached by that same car five or six times. And while Mr. Magallanes's trial testimony was contradictory on the point, Deputy Klinefelter testified that Mr. Magallanes told him that "the same car and the same people inside the car shot at him previously."

On the occasion of the Magallanes shooting, the four defendants drove to Mr. Magallanes's neighborhood, and found him walking near his home. One of the four gang members in the car (Sandoval) was carrying a loaded revolver, and it was either in his waistband or, as Mr. Magallanes testified, "[h]e already had it on his lap," "in his hand" when he got out of the car. The three defendants remaining in the car fled the scene together after the shooting, but were still in the car in the general area when they were apprehended. There was also testimony about gang culture, and that it was "very important" to have other gang members present at a crime to "support[] the guy and also hav[e] a witness to what the other gang member is committing."

In short, the evidence showed far more than Mr. Virto's "mere presence" at the crime scene. We reject his assertion there was no evidence he participated in or knew of the earlier incidents targeting Mr. Magallanes, or that he knew Mr. Sandoval had a gun, or "as a passenger, was part of any plan." On the contrary, from the evidence we have recited, the jurors could reasonably infer that Mr. Virto, as well as the other defendants in the car, not only knew of, but also shared and facilitated Mr. Sandoval's murderous intent.

3.      **Sufficiency of the Evidence of Premeditation and Deliberation**

Defendants Zamora and Sierra contend there was insufficient evidence of premeditation and deliberation in the Magallanes shooting, and Sierra (who inflicted the stab wounds on victim Perez) makes the same claim as to the stabbing of Mr. Perez. Both defendants contend there was insufficient evidence of their intent to kill in the Perez stabbing. We see no deficiency in the evidence.

    **a.      The legal principles**

We have already recited the principles governing substantial evidence.

24

Attempted murder requires "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the offense." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.)

Premeditation means " 'considered beforehand' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 (*Mayfield*), disapproved on another point in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2), and deliberation means a " 'careful weighing of considerations in forming a course of action . . . .' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812). "The process of premeditation and deliberation does not require any extended period of time." (*Mayfield*, at p. 767 [the true test of premeditation is the extent of the reflection, not the length of time].) " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*Ibid.*) "The act of planning—involving deliberation and premeditation—requires nothing more than a 'successive thought[] of the mind.' [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658.)

"Courts often use the three factors set forth in *People v. Anderson* (1968) 70 Cal.2d 15 as a guide to analyzing whether there is substantial evidence of premeditation and deliberation. (*Id.* at pp. 26-27.) Those three factors are: (1) planning activity (i.e., facts about what defendant did prior to the killing that show he was engaged in activity directed toward killing); (2) motive (i.e., facts about the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill the victim); and (3) method (i.e., facts about the manner of the killing from which the jury could reasonably infer that defendant had a preconceived design to take the victim's life in a particular way). (*Ibid.*)" (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 10.) The *Anderson* factors provide "a helpful synthesis of prior case law," but are not prerequisites for proving premeditation and deliberation, "nor must the factors ' "be present in some special combination or . . . be accorded a particular weight." ' [Citation.]" (*Id.* at p. 10 & fn. 16.)

25

### b. The Magallanes shooting

Defendants Zamora and Sierra contend the evidence was insufficient to support their convictions of attempted willful, deliberate, and premeditated murder in the Magallanes shooting. They insist also that the prosecution did not prove their intent to kill. We have already rejected the latter claim (pt. 2.b., *ante*), to the extent they claim there was no proof they shared defendant Sandoval's murderous intent. To the extent they contend the evidence "showed beyond dispute" that defendant Sandoval "made no effort to actually injure [Mr. Magallanes]," because "[n]o bullet strikes were found" and Mr. Magallanes "was not injured" in this or the previous incident, the claim is frivolous. The evidence plainly showed Mr. Sandoval shot at Mr. Magallanes three times, and indeed pursued Mr. Magallanes while he was shooting at him. Olivia Magallanes testified she saw the shooter pointing the gun at her brother's upper body and "chasing my brother with the gun, shooting at my brother." (See *People v. Smith* (2005) 37 Cal.4th 733, 742 ["the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill"].)

Mr. Zamora contends his conviction should be reduced to simple attempted murder, because the evidence at trial "showed a sudden confrontation that was entirely spontaneous and not planned in any way." He says there was no evidence of the planning, motive and method factors that *Anderson* used for establishing premeditation and deliberation. Mr. Sierra makes a similar argument. We do not agree.

The evidence established gang rivalry as the motive for the shooting; all four defendants were members of the CVS gang and the victim associated with a rival gang.

The evidence likewise supported planning activity directed toward killing Mr. Magallanes. In the months before the shooting, Mr. Magallanes had five or six encounters with the black Hyundai; someone in the car would always say something disrespectful. "Either they would dis my neighborhood or they would say 'Fuck you' or something." Mr. Magallanes testified he feared there would be a fight or a shooting. The evidence showed defendants Sierra, Zamora, Salazar and a fourth person came to

26

Mr. Magallanes's house with a gun three or four weeks earlier, calling out their gang name and trying to get Mr. Magallanes to come outside; when he did not, they hurled insults, leaving when Olivia Magallanes threatened to call the police. Defendant Zamora came to Mr. Magallanes's house in the same black car on another occasion with two other people; Mr. Magallanes, who was with his cousin, ran inside and the cousin had a loud exchange of words with the people in the car until Olivia Magallanes told the cousin to come inside. On still another occasion, one or two weeks before the shooting, someone in the same black car tried to shoot Magallanes.

Finally, the evidence described above, along with the evidence of what happened on the evening of the shooting, allowed the jury to "reasonably infer that . . . defendant[s] had a preconceived design to take the victim's life in a particular way." (*People v. Shamblin, supra,* 236 Cal.App.4th at p. 10.) On the evening of the shooting, defendants armed themselves with a revolver and again drove to Mr. Magallanes's neighborhood in the black car. They slowed when they saw him, allowing defendant Sandoval to get out of the car. Defendant Sandoval pointed the gun at Mr. Magallanes's upper body, and pursued him with the gun, firing multiple shots at him.

In short, the facts we have recited provide substantial evidence of premeditation and deliberation. We are in no doubt that a reasonable jury could infer from these facts that defendants planned to kill Mr. Magallanes, had a motive to do so, and attempted to do so in a manner calculated to result in his death.

### c.   The Perez stabbing

Defendant Zamora contends, in a one-paragraph argument, the prosecution failed to show an intent to kill Perez. As he describes it, there was "a scuffle" with Mr. Perez; he (defendant Zamora) pulled a knife which Mr. Perez parried; and Mr. Zamora was about to lose the fight when defendant Sierra came to his rescue. That rendition of the facts omits most of the evidence, from which (as discussed below) intent to kill may reasonably be inferred.

Defendant Sierra, who inflicted the knife wound, contends the evidence was insufficient to show intent to kill, premeditation and deliberation. He contends there was

27

no evidence of any of the *Anderson* factors; that his action in "join[ing] the fray" was "sudden and responsive to the escalation" that occurred when defendant Zamora brought out a knife during the "initial fist fight"; and that a single stab wound to the side "does not evince an intent to kill." Defendant is mistaken.

We have described the evidence in part 1.a. of the facts, *ante*, and will not repeat it in detail here. That evidence plainly allows the inference that Zamora and Sierra intended to kill Mr. Perez, and that Mr. Sierra acted with premeditation and deliberation in his attempt to do so. Defendants, driving in the black Hyundai, pulled over and accosted Mr. Perez, asking about his visible tattoos and gang affiliation. Some 20 minutes later, the black Hyundai pulled over again; this time, voices in the car said, "This is Segundos" and "Fuck Sans Street" and "Get out of my hood," and then the driver told the backseat passengers to "come out and get [the victim]." That is clear evidence of motive – gang animus toward other gangs – as well as planning; 20 minutes elapsed before the black Hyundai approached the victim for the second time and the driver instructed defendants Zamora and Sierra to "get" the victim. This is substantial evidence of planning.

Further, the evidence showed Mr. Perez tried to run away and Mr. Zamora pulled him back; it also showed Mr. Zamora tried to stab the victim in the neck with a knife. The evidence also supported the inference that Mr. Sierra had a "preconceived design" to take the victim's life with the method he used: when he saw his cohort was not succeeding in the attack on Mr. Perez, he approached with a knife and stabbed Mr. Perez in the side – a stabbing that resulted in serious injuries requiring surgery and a nine-day hospitalization. And, one of the two said, "Fuck you. I hope you die," before they fled in the black Hyundai. In short, as with the Magallanes shooting, the circumstances surrounding the Perez stabbing permit the inference that defendants planned to kill Mr. Perez, had a motive to do so, and attempted to do so in a manner calculated to result in his death.

28

**4.** **The Refusal to Instruct on Lesser Included Offenses**

    **a.** **Attempted voluntary manslaughter**

Attempted voluntary manslaughter is a lesser included offense of attempted murder. A person who unsuccessfully attempts to kill another, and who does so "with the intent to kill which was formed in a heat of passion or which arose out of an honest but unreasonable belief in the necessity of self-defense," is guilty of attempted voluntary manslaughter rather than attempted murder. (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 820, 824-825.)

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8; see *People v. Breverman* (1998) 19 Cal.4th 142, 162 ["the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense"].) "This instructional requirement ' "prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' " ' ' " (*Brothers*, at pp. 29-30.) "We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citations]." (*Id.* at p. 30.)

Defendants Sierra and Zamora requested an instruction on attempted voluntary manslaughter in connection with the Perez stabbing count. They argued that, on cross-examination, Mr. Perez gave a "secondary version" of events that was consistent with attempted voluntary manslaughter: that Mr. Perez was not afraid of defendants and "stood there challenging the defendants"; that Zamora got out of the car; the two engaged

29

in a physical fight, exchanging blows, after which Zamora pulled out a knife and tried to stab Mr. Perez; and then defendant Sierra came up from behind and stabbed Mr. Perez.

After considerable argument on the point, and taking the matter under consideration, the trial court ultimately refused to instruct on attempted voluntary manslaughter. We find no error.

According to defendant Sierra, testimony from Mr. Perez supported the theory that Sierra's actions "were in defense of others – Zamora – or upon the heat of passion provoked by the sight of his friend being beaten." Defendants' contentions depend upon the mistaken notion that the testimony shows Mr. Perez challenged the occupants of the car to a fight. It does not.

First, Mr. Zamora's assertion that Mr. Perez said, "come on out," is wrong. There is no such testimony. Second, the claim that Mr. Perez's testimony supports the claim that he "challeng[ed] [Zamora] to a fight" is a mischaracterization of the testimony.

Like the trial court, we see nothing in Mr. Perez's testimony from which a reasonable juror could conclude that this incident began as "mutual combat." Mr. Perez's testimony was consistent throughout that he did nothing more than defend himself after Zamora pulled him back when he tried to run away. "[A]s used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045.)

Moreover, so far as Mr. Zamora is concerned, imperfect self-defense is not an available defense, because he was the initial aggressor. (See *People v. Seaton* (2001) 26 Cal.4th 598, 664 ["Because . . . defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter."]

There is likewise no testimony from which a reasonable juror could conclude that Mr. Perez did anything inflammatory to provoke anyone in the car, or that Sierra acted "upon the heat of passion provoked by the sight of his friend being beaten." (See *People v. Lee* (1999) 20 Cal.4th 47, 60 ["Theprovocation must be such that an average, sober

30

person would be so inflamed that he or she would lose reason and judgment. Adequate provocation and heat of passion must be affirmatively demonstrated."].) There was no basis for an instruction on attempted voluntary manslaughter.

### b. Assault with a deadly weapon

Defendant Zamora also argues the court erred in refusing to instruct on assault with a deadly weapon, as to both the Magallanes shooting and the Perez stabbing, "[s]ince there was evidence that the incidents charged in this case were assaults and not attempted murders . . . ." There is no merit in defendant's assertion.

Assault with a deadly weapon is not a lesser included offense of attempted murder. (*People v. Richmond* (1991) 2 Cal.App.4th 610, 616 ["assault with a deadly weapon is not a lesser included offense of attempted murder with the use of a deadly weapon, because attempted murder can be committed without using a deadly weapon"; "allegation of deadly weapon use . . . is not to be considered as part of the accusatory pleading in determining whether assault with a deadly weapon is a lesser included offense of attempted murder"]; see also *People v. Sloan* (2007) 42 Cal.4th 110, 114 [referring to the "longstanding rule that enhancements may not be considered as part of an accusatory pleading for purposes of identifying lesser included offenses"]; *People v. Alarcon* (2012) 210 Cal.App.4th 432, 439 ["trial court did not err in declining to instruct on assault with a deadly weapon as a lesser included offense of attempted murder"].)

Defendant Zamora does not discuss these authorities, arguing only that "this case was overcharged" and, in effect, that the court must instruct on an offense not charged by the prosecutor if the evidence supports that offense. Defendant proffers no authorities supporting his proposition, and accordingly we do not consider it further.

### 5. The Gang-related Issues

### a. The gang expert's qualifications

Counsel for defendants Sandoval and Zamora moved to exclude Detective Jara's testimony as a gang expert, arguing she did not qualify as an expert. The trial court denied the motion.

A trial court may permit police officers to testify as gang experts, "based upon their 'special knowledge, skill, experience, training [and] education' (Evid. Code, § 720) related to gangs." (*People v. Williams* (1997) 16 Cal.4th 153, 195 (*Williams*).) The trial court has "considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion in shown." (*People v. Bloyd* (1987) 43 Cal. 3d 333, 357.)

There was no abuse of discretion here. Detective Jara took two semester courses in sociology focusing on gang cultures when she was an undergraduate. In 1999, during her academy training as a custody assistant, she attended a 16-hour course on gang culture in a custodial environment. She worked for five years in the county jails, where she spoke with over 200 gang members on gang culture and their personal experiences in gangs. When she was promoted to deputy sheriff, she attended a 40-hour course of instruction on gang culture. In 2007, she was assigned to patrol at the Lakewood Station for four years, contacting numerous gang members and investigating gang-related crimes. She trained newly assigned deputies on how to recognize gang-related crimes. She assisted the gang unit in gang-related investigations and search warrants. In March 2011, she was promoted to gang detective. She investigated approximately 50 gang-related crimes. She attended a 40-hour gang investigator's school focusing on gang culture, and received weekly briefings on gangs as a member of the California Gang Investigators Association. She also grew up in areas infested with gangs.

Plainly, Detective Jara was qualified as a gang expert by her training, education and experience. (See, e.g., *People v. Montes* (2014) 58 Cal.4th 809, 861 [police officer had six years of experience, 20 to 30 hours of training in the identification of gang members, and was specifically familiar with the gang in question, but had never before qualified to testify in court; trial court did not abuse its discretion in allowing him to testify as a gang expert]; *Williams*, *supra*, 16 Cal.4th at p. 195 [officer who was "a member of a special Los Angeles Police Department gang unit, had been involved with gangs for seven years and had attended numerous professional seminars regarding gangs"

32

was qualified as a gang expert; "[w]e have found qualified, as gang experts, officers with investigative experience similar to that of the officers here," citing cases].)

### b. The gang photographs

As noted earlier, the trial court excluded from evidence a YouTube video depicting the CVS gang, finding it more prejudicial than probative, but admitted 23 still images from the video, including stills of defendant Sierra's moniker (Sleepy); of Joshua Garcia (who was identified as allegedly intimidating witnesses) with a tattoo; of an area claimed by the CVS gang; of threatening gang graffiti; of a hat that was the same as the hat in the Magallanes shooting incident; and the like. The court also stated it would permit Detective Jara to testify that she had watched the video, that "in her opinion as an expert, this is what the gang culture does," and that she had heard the rap lyrics in the video. The court observed the still photographs would be relevant to corroborate Detective Jara's expertise.

Defendants assert the trial court abused its discretion when it admitted the photographs, because they were "not admissible as the basis of expert opinion," and even if they were admissible, they were more prejudicial than probative. Again we disagree.

It is settled that an expert witness may base an opinion on matters that would otherwise be inadmissible under the hearsay rule. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) Indeed, experts have been permitted to recite hearsay statements verbatim and at length. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 504, 509, 510-511 (*Valdez*) [expert was allowed to read verbatim and explain gang-related portions of letters; "[u]nder *Gardeley*, we find it well within the trial court's discretion to permit [the expert] to relate in detail the large amount of hearsay upon which he relied."].) We see no significant difference in the admission of the photographs in this case, and defendant cites no pertinent authority to the contrary. As the trial court observed, the photographs formed part of the basis of Detective Jara's opinion "as to why all five defendants are gang members, what monikers they have, what type of clothing they wear, and things of that nature."

Nor do we see any abuse of discretion in the trial court's conclusion that the probative value of the photographs outweighed any prejudice to defendants. The *Valdez* court's conclusion is equally applicable here: "The trial court could reasonably conclude that [the expert's] opinions were very relevant to prove the gang enhancement allegation and further that the hearsay upon which he based his opinions was highly probative on his credibility and the weight to be given his opinions. The court could also reasonably find that these factors outweighed any prejudice from the hearsay . . . because [among other reasons] it did not directly name or implicate defendant in any other criminal activity . . . ." (*Valdez, supra,* 58 Cal.App.4th at p. 511.)

### c.     The gang expert's refusal to identify gang informants

As we have mentioned, Detective Jara opined that both crimes were committed for the benefit of a criminal street gang, CVS.

On cross-examination, counsel for defendant Sierra asked Detective Jara whether she had "talked to any other CVS gang members to find out in what way CVS was benefited by" the crimes allegedly committed by the defendants, and she responded, "Yes." Counsel then asked Detective Jara, "And who did you talk to?" and the detective said, "I'm not going to answer that. Or assert 1040 and 1041 of the Evidence Code." (Those sections govern privileges not to disclose official information and the identity of an informer.) Counsel moved to strike Detective Jara's testimony.

The court denied the motion, among other things pointing out that Detective Jara "has never stated that, because she has spoken to other individuals, that she is using that as a basis of her opinion in this case."

Defendants contend the trial court erred, and should have held an in camera hearing "to determine whether [Detective] Jara had relied upon that information, the nature of the information, and its importance to the defense," or at least should have struck the "yes" answer from the record, to eliminate the implication that she had "outside information supporting her opinion which she had not shared with the jury." These contentions have no merit.

34

Evidence Code section 1042 governs the procedures that apply when a party demands disclosure of the identity of a confidential informant "on the ground the informant is a material witness on the issue of guilt . . . ." (*Id.,* subd. (d).) The procedures include "a hearing at which all parties may present evidence on the issue of disclosure," during which the prosecutor may request an in camera hearing, so the court can determine "whether there is a reasonable probability that nondisclosure might deprive the defendant of a fair trial." (*Ibid.*)

Notably, "[i]t is incumbent on the defendant to make a prima facie showing for disclosure before an in camera hearing is appropriate. [Citation.] [¶] Disclosure is mandated only when the defendant, upon whom the burden falls, produces ' "some evidence" [citation]' [citation] to show ' "a reasonable *possibility* that the anonymous informant whose identity is sought could give evidence on the issue of guilt which *might* result in defendant's exoneration." [Citations.]' [Citation.]" (*People v. Oppel* (1990) 222 Cal.App.3d 1146, 1152; *People v. Fried* (1989) 214 Cal.App.3d 1309, 1314-1315 [an in camera hearing is not required "if an informant is not shown to be in a position to give possible testimony which will aid the defendant on the issue of guilt. The mere assertion that the informant is a material witness on that issue, without any plausible support therefor, does not trigger the requirements of the statute."].)

Here, defendants offered no evidence or plausible support for the claim that any CVS gang member with whom Detective Jara spoke could give evidence on the issue of guilt – here, whether the crimes were committed for the benefit of CVS – that might result in defendants' exoneration on that allegation. Indeed, defendant's only theory (unsupported by any evidence) is that there is a reasonable possibility the informant could provide "evidence that the crimes were not sanctioned by the gang." Further, as the trial court pointed out, Detective Jara at no time indicated she was relying on information from CVS gang members in forming her opinion that the crimes benefitted the gang, and a review of her testimony does not suggest otherwise.

In short, there is no legal basis for the contention the court should have held an in camera hearing. Nor do we see any abuse of discretion in the trial court's refusal to strike

the answer "yes" to defense counsel's question whether she had talked to other gang members on the subject of benefit to the gang. Certainly defendants have shown no prejudice from that ruling.

**6.     Defendants' Admission of Gang Affiliation During Booking**

Defendants contend the trial court erred in admitting into evidence statements they made during the booking process, admitting they were CVS gang members. Admission of this evidence was error, but it was not prejudicial.

**a.     The background**

During the booking process, defendants Sierra, Sandoval and Zamora admitted they were CVS gang members. (Defendant Virto did not admit gang membership, but admitted that he associated with the CVS gang. He denied having a moniker or gang name.) These admissions were recorded on booking slips showing the three defendants were asked and stated their gang affiliations when they were booked.

At trial, the court overruled objections to the admission into evidence of the statements in the booking slips, relying on the booking exception to *Miranda*. At the time of trial, there was case authority for the proposition that routine questions during booking about gang affiliation, posed for security purposes and not designed to elicit an incriminating response, may come within the booking exception. (*People v. Gomez* (2011) 192 Cal.App.4th 609, 635, 634 (*Gomez*).)

The California Supreme Court has decided this question in defendants' favor. In *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), the court rejected the analysis in *Gomez* and held that questions about gang affiliation exceed the scope of the booking exception. (*Elizalde,* at p. 527, 538 & fn. 9.)

**b.     Prejudice**

As *Elizalde* instructs, "[t]he erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)]. [Citations.] That test requires the People here 'to prove beyond a reasonable doubt that

36

the error complained of did not contribute to the verdict obtained.' (*Chapman*, at p. 24.)" (*Elizalde, supra,* 61 Cal.4th at p. 542.)

We conclude respondent has met its burden under *Chapman*. Without regard to defendants' admissions, there was substantial and uncontroverted evidence of the gang membership of all four defendants, removing any room for doubt on the point. We describe the evidence as to each defendant.

### i.      Defendant Sierra

Detective Jara opined that defendant Sierra was a CVS gang member. "He has numerous tattoos on his body that depict his membership to Compton Varrio Segundo, in addition to he's been contacted by law enforcement where he admits to being a gang member from Compton Varrio Segundo. [¶] He's been with other documented gang members from Compton Varrio Segundo. And the night of the incident, he was with Defendant Virto and Defendant Zamora, who are Compton Varrio Segundo gang members."

Detective Jara testified that Mr. Sierra's moniker was "Sleepy," and she knew that because he had admitted to that moniker in contacts with the police that were "a couple of years" old. The detective identified photographs of defendant Sierra and his tattoos, including several tattoos on his right hand. These included the Roman numeral "II" and "CVS" on one finger. Another tattoo showed a "P" with a "K," meaning, in her opinion, "Paramount killer." Another was a common saying, "2's up," and still another showed an "S" and a "P"; Detective Jara opined that " 'S' is for Segundos and 'P' is for the clique Pachucos, which . . . is the clique that he's a part of." On his right inner forearm and on his legs, Mr. Sierra had tattoos of "C" and "2." On his back he had a "2" and "PCHS"; Detective Jara testified "PCHS" meant the clique "Pachucos." On his ankle was a tattoo of the number "2" and on his right thigh was "CVS."

The detective also identified F.I. cards for Mr. Sierra, dated December 15, 2010, and June 12, 2011. (Detective Jara testified that an "F.I. card" is "a field interview card that law enforcement generally uses to document their contact with a gang member.") The F.I. cards showed that Mr. Sierra admitted he was a member of CVS. (He gave

police the moniker "Spark Plug" (not "Sleepy").) Detective Jara testified there was a "gang trend" to give police different monikers "from what their true identity is within their gang," because the police were "coming after them with the gang graffiti and identifying them in that way." The December 15, 2010 card also showed that he was with another CVS gang member.

### ii. Defendant Sandoval

Deputy Leticia Reyes testified that, when he was booked, defendant Sandoval had several tattoos. "He had 'Segundo' on the right leg; and on the left leg, he had 'Compton.' . . . [O]n his right hand on the back, he had 'Mi Familia Primero,' 'Mi Varrio Segundo,' " "which means 'my family first,' 'my hood' – or 'neighborhood' – 'second.' "

Detective Jara testified that, in her opinion, Mr. Sandoval was a CVS gang member, and described the same bases for that opinion as for the other defendants. She identified photographs of defendant Sandoval, showing tattoos on his back ("Mi Varrio Segundo") and tattoos on his legs ("Compton" on the left and "Segundo" on the right). Detective Jara also identified two F.I. cards, both dated August 29, 2010. One of them showed Mr. Sandoval was detained with CVS gang member Raymond Martinez (Stranger), and the other, later in the day, showed he was with Martinez and defendant Zamora. The cards showed that Mr. Sandoval admitted his gang affiliation, CVS, and gave the moniker "Ghost," which was "the moniker [Detective Jara knew] him to have as well."

### iii. Defendant Zamora

Detective Jara testified she was familiar with defendant Zamora, and opined that he was a CVS gang member, again noting the same bases for her conclusions as for the other defendants. She identified photographs of defendant Zamora, who had tattoos on his legs of "the letter 'C' and the '2' for 'Compton Segundo.' " She identified two F.I. cards showing police contacts with Mr. Zamora on September 2 and September 7, 2010. In each case, the cards indicated that Mr. Zamora admitted his gang affiliation with CVS. Detective Jara testified that Mr. Zamora gave the moniker of "Blacky" on one

of the F.I. cards, but had also given the moniker "Darky," and that she knew his true moniker to be "Darky." One of the cards showed that Mr. Zamora was with CVS gang member Raymond Martinez and another CVS gang member, Javier Ruiz.

### iv. Defendant Virto

Deputy Andrade testified that, when he was booked, defendant Virto had "several Compton Varrio Segundo tattoos to the back of his head." Detective Jara testified that she was familiar with defendant Virto, and opined that he was "a gang member from Compton Varrio Segundo. He has several tattoos depicting his membership to Compton Varrio Segundo. [¶] Specifically, he has 'CVS' on his chest for 'Compton Varrio Segundo"; 'Sur' on his stomach for 'Surenos.' [¶] . . . [¶] Then on his back, he has 'CPT' for 'Compton'; and then he has a large number '2' on his back. And then he has 'CVS' on his right and left arms for 'Compton Varrio Segundo.' [¶] He's been contacted by law enforcement, not only in this county, but in Riverside County where he admits to being a gang member from Compton Varrio Segundo. [¶] In addition to that, on June 12th he was stopped in that black vehicle with Defendant Sierra and Defendant Zamora, who we also know that are Compton Varrio Segundo gang members."

Detective Jara identified photographs showing Mr. Virto's gang tattoos, and explained that " 'Sur' is a representation of South Side, which is Southern California gangs, the region which are Hispanic gangs." She reviewed and identified three F.I. cards for Mr. Virto, dated November 27, 2010, February 6, 2011, and June 12, 2011, all of them showing that Mr. Virto admitted gang affiliation with Compton Varrio Segundo.

Detective Jara testified that Mr. Virto has the moniker "Silent." She stated that, while Mr. Virto had never given his moniker to law enforcement personnel, she learned "through jail phone calls what his moniker was, in addition to I had other corroborating information from the gang unit within the Los Angeles County jails to corroborate that his [moniker] is Silent."

Detective Jara also testified about the significance of gang tattoos. She stated: "Well, the tattoos [are] part of the gang culture. It just shows your membership to the

39

tattoo. It's not a mandatory thing, but it's something that shows their pride and their loyalty to the gang. [¶] You can't get a tattoo if you're not a member. If you have not joined the gang, there's no way that you can get the tattoo of that gang on your body. You'll be killed if you did that." She also testified that "tattoos have to be earned," and they are earned by "putting in work; committing crimes."

In addition to Detective Jara's testimony as a gang expert, victim Perez testified that, when the black car approached him the second time, he heard voices inside the black car say, "This is Segundos" and "Fuck Sans Street" and "Get out of my hood." Later at the hospital, Perez told the police he knew his attackers "were from CVS." And, when Mr. Magallanes testified about his previous encounters with the black car, he said that the occupants were from the "Segundos" gang.

### c.    Conclusion

As in *Elizalde*, "[b]ecause [defendants'] gang affiliation was amply established by independent and uncontradicted evidence, the erroneous admission of [their] challenged statements was harmless beyond a reasonable doubt." (*Elizalde, supra,* 61 Cal.4th p. 542.)

## 7.    Defendant Sandoval's Severance Motion

Mr. Sandoval contends the trial court erred in denying his motion for severance. We agree, but conclude the error was not prejudicial.

Under section 1098, "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." In *People v. Ortiz* (1978) 22 Cal.3d 38, 43 (*Ortiz*), the Supreme Court construed section 1098 to mean "that a defendant may not be tried with others who are charged with different crimes than those of which he is accused unless he is included in at least one count of the accusatory pleading with *all* other defendants with whom he is tried." (Italics added.)

In this case, defendant Sandoval moved to sever his case from that of his codefendants, based on the principle established in *Ortiz*: Mr. Sandoval, who was charged only with the Magallanes shooting, was tried with defendant Noe Salazar, who

was charged with different crimes (the Perez stabbing and the witness dissuasion counts) which did not involve Mr. Sandoval in any way. Thus Mr. Sandoval was *not* included "in at least one count of the accusatory pleading with all other defendants with whom he [was] tried." (*Ortiz, supra,* 22 Cal.3d at p. 43.) In this circumstance, *Ortiz* concluded that "the trial court was required to grant the [severance] motion as a matter of law under section 1098 . . . ." (*Id.* at pp. 42-43; see *id.* at p. 46 ["we deal here with a severance motion which the trial court did not have the discretion to deny"].)

On appeal, Mr. Sandoval renews his contention that the trial court erred in refusing to sever his case. *Ortiz* compels us to agree. However, as in *Ortiz,* "[w]e next inquire whether the error in denying defendant's motion for severance was prejudicial so as to require reversal of the conviction." (*Ortiz, supra,* 22 Cal.3d at p. 45.)

Before we proceed to that analysis, we pause to reject respondent's apparent contention that this case falls within an exception to the *Ortiz* requirement, as found in *People v. Hernandez* (1983) 143 Cal.App.3d 936 and *People v. Wickliffe* (1986) 183 Cal.App.3d 37. Those cases held that the Supreme Court in *Ortiz* "did not intend to extend its ruling to cases . . . where codefendants jointly committed a series of crimes against the same victim at the same time and in the same place." (*Hernandez,* at pp. 939, 938 [all offenses arose out of a "gang rape" after a party given by the victim]; *Wickliffe*, at p. 41 [victim was injured when one defendant knocked him from a moving truck, and rear wheels of the truck, driven by intoxicated codefendant, crushed his midsection; although charged with different offenses, defendants were properly tried together because the offenses "arose from a single set of circumstances against the same victim during the same time and in the same place"].) Plainly, this case does not come within the *Hernandez* rule – the crimes charged here were committed under different circumstances, against different victims, and at a different time and different place.

The error in denying severance was not prejudicial. Again we are guided by *Ortiz*. The right to a separate trial "is not so fundamental that its erroneous denial requires automatic reversal." (*Ortiz, supra,* 22 Cal.3d at p. 46.) The factors to be applied in determining whether a denial of severance was prejudicial "include whether a separate

41

trial would have been significantly less prejudicial to defendant than the joint trial, and whether there was clear evidence of defendant's guilt." (*Ibid.*) We reverse "only upon a showing 'of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial.'" (*Ibid.*)

In this case, the evidence Mr. Sandoval was guilty of the attempted premeditated murder of Mr. Magallanes was overwhelming. He was identified as the shooter by both Raul and Olivia Magallanes. He shot at Mr. Magallanes three times, and indeed pursued Mr. Magallanes while he was shooting at him. Olivia Magallanes saw the shooter pointing the gun at her brother's upper body. The police found Mr. Sandoval hiding underneath a truck not far from the crime scene. He was not wearing the hat and T-shirt Mr. Magallanes described the assailant as wearing, but the police found those items, along with a revolver with three expended casings, underneath some shrubbery near the crime scene. Mr. Sandoval tested positive for gunshot residue.

On the record in this case, no reasonable juror could have doubted either that Mr. Sandoval was the shooter or that he intended to kill – certainly the facts that he did not hit his target or expend all his bullets do not detract from the evidence of intent to kill. The evidence against Mr. Sandoval left no doubt of his guilt, and the assertion that the jury must have been affected by the evidence of the intent of the other defendants in the other case is entirely speculative, without support in the record. The jurors were clearly instructed on which defendants were charged with which crimes, and that they must "separately consider the evidence as it applies to each defendant" and "decide each charge for each defendant separately." We have no reason to assume they did not do so.

Mr. Sandoval also contends the improper joinder "exposed the jury to highly prejudicial evidence of Salazar's jail calls" relating to witness dissuasion, and to a single reference by the gang expert to the Mexican Mafia in connection with Salazar's jail calls. But the reference to the Mexican Mafia was stricken from the record, and the jury was instructed during the trial that the jail recordings it heard "are only to be considered against Defendant Salazar, Noe Salazar in this case. [¶] It is not to be used or considered in any way or any fashion during your deliberations against Defendants Virto, Sierra,

42

Sandoval, or Zamora. Only against Defendant Salazar." Again we have no reason to believe the jury did not follow these instructions.

In sum, the record discloses no probability that Mr. Sandoval would have obtained a more favorable result at a separate trial. (*Ortiz, supra,* 22 Cal.3d at p. 46.)

**8.     Cruel and Unusual Punishment**

Defendant Sandoval, who was 15 years old when he committed the offenses, was sentenced to 35 years to life in prison: 15 years to life for attempted willful, deliberate and premeditated murder in the Magallanes shooting (§ 664, subd. (a) & § 186.22, subd. (b)(5)), plus 20 years consecutive for the firearm discharge enhancement (§ 12022.53, subd. (c)). Defendant Zamora, who was 17 years old at the time of the crimes, was sentenced to 43 years to life in prison: 15 years to life for attempted willful, deliberate and premeditated murder in the Magallanes shooting, plus 20 years consecutive for the firearm discharge enhancement (§ 12022.53, subd. (e)), plus the midterm of seven years consecutive for attempted murder in the Perez stabbing (§ 664, subd. (a)), plus one year consecutive for personal use of a deadly weapon (§ 12022, subd. (b)(1)).

Both defendants challenge their sentences as cruel and unusual punishment under the Eighth Amendment. Their claims have no merit. Their sentences were mandated by law, and fully consonant with constitutional principles established by the high court and our Supreme Court for the sentencing of juvenile offenders convicted of nonhomicide offenses.

**a.     The facts**

At the sentencing hearing for defendants Sandoval and Zamora, the trial court stated it had reviewed all the documents submitted on behalf of defendants (school records, letters from family members and friends, sentencing memoranda, probation reports, and a psychologist's report). The prosecutor indicated her understanding that "we're here for a hearing with regard to the two defendants' maturity level for purposes of mitigating circumstances for sentencing." The trial court then heard testimony from

43

Mr. Sandoval's mother and from two psychologists on issues including defendants' amenability to rehabilitation.

After hearing argument, the court reviewed factors in mitigation and aggravation for Mr. Sandoval. In mitigation, the court found Mr. Sandoval was 15; committed the offense with another juvenile and two adults; the victim was not injured; Mr. Sandoval's father left the home when Mr. Sandoval was 10 or 11 years old; his four siblings were never involved in the criminal justice system; he was average or above average when he attended school; and he had no major substance abuse problems. As aggravating circumstances, Mr. Sandoval had "multiple involvements with the criminal justice system dating back to 2009"; had been released from an eight-month stay in juvenile camp for less than a week when he committed this offense; and was the actual shooter in a gang confrontation.

The court concluded it had "very little discretion" in sentencing and imposed the 35 years to life sentence described above. The court recommended, "for whatever it is worth," that Mr. Sandoval should be given a parole hearing at the first possible opportunity. Observing this would be by the age of 45, the court referred to "new law and legislation," and said that "if it is done earlier for juveniles, the court highly recommends that Mr. Sandoval be given a parole hearing earlier."

In Mr. Zamora's case, the court likewise reviewed factors in mitigation and aggravation. In mitigation, the court found Mr. Zamora was 17; he was an aider and abettor in the shooting; he had a low intelligence level and suffered from depression. The aggravating factors were his involvement in two violent offenses with other gang members only a week apart; in the second offense he had a knife and attempted to stab the victim, who was actually injured by Mr. Zamora's fellow gang member; and he had been involved in the criminal justice system since the age of 13.

The prosecutor sought a sentence of 55 years to life. The court sentenced Mr. Zamora to 43 years to life as described above. (In addition to imposing the middle term for the Perez stabbing, the court found good cause to stay the 10-year gang enhancement, based on the mitigating factors and the victim's full recovery from his

44

injuries.)  The court again concluded that its "hands [were] tied by mandatory sentencing structure that gives the court little to no discretion in sentencing Mr. Zamora," and that Mr. Zamora, "depending on how well he is rehabilitated in prison, can be and should be considered for parole" after serving his statutory minimum sentence.

####       b.       The law

The Eighth Amendment prohibits states from sentencing a juvenile convicted of nonhomicide offenses to life imprisonment without the possibility of parole.  (*Graham v. Florida* (2010) 560 U.S. 48 (*Graham*).)  The Eighth Amendment also prohibits a mandatory life without parole sentence for juvenile offenders.  (*Miller v. Alabama* (2012) 567 U.S. ___ [132 S.Ct. 2455] (*Miller*).)  And the Eighth Amendment prohibits states from sentencing a juvenile convicted of a nonhomicide offense "to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy . . . ."  (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*).)

None of those things happened here.  The sentences imposed complied in full with the Supreme Court's direction in *Caballero*:  "Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board.  The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'  [Citation.]"  (*Caballero, supra,* 55 Cal.4th at pp. 268-269.)

Mr. Sandoval's mandatory sentence of 35 years to life does not deprive him of "a parole eligibility date that falls outside [his] natural life expectancy," or a "meaningful opportunity to demonstrate [his] rehabilitation and fitness to reenter society in the future."  (*Caballero, supra,* 55 Cal.4th at p. 268.)  On the contrary, as discussed at the sentencing hearing, Mr. Sandoval will be 45 years old when he is first eligible for parole, well within his life expectancy.  Under these circumstances, the sentence meets

45

constitutional requirements, and the trial court had no discretion to impose a sentence other than the one mandated by statute.

Mr. Sandoval contends that "depriving the trial court [of] discretion to consider Sandoval's age before imprisoning him for approximately half his expected life span violated the Eighth Amendment." He cites no California or federal authority for this proposition – merely "the logic of *Graham*, *Miller*, and their progeny" – and we are aware of none. (See *People v. Perez* (2013) 214 Cal.App.4th 49, 52 (*Perez*) ["There is no rule of constitutional jurisprudence that *requires discretion* to reduce penalties when minors are sentenced for adult crimes to periods which still leave them a substantial life expectancy after release from prison."].)

Mr. Zamora makes similar arguments. He points out that "the earliest he could be released is at the age of 53 and ½ years" (and he notes his "total life expectancy is 82.1 years," or "somewhat shorter" since he is "Hispanic"). Thus, he says, "he will be incarcerated virtually all of his productive life." We do not see it that way. As in *Perez*, Mr. Zamora has cited "no case which has used the []*Graham-Miller-Caballero* line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole." (*Perez, supra,* 214 Cal.App.4th at p. 57.) And, while "[h]ow *much* life expectancy must remain" is a matter for future judicial development, "we can safely say that in the case before us there is plenty of time left . . . ." (*Ibid.*; *id.* at p. 58 [defendant eligible for parole at age 47; "by no stretch of the magination can this case be called a 'functional' or 'de facto' LWOP"].) The same is true here.[6]

---

[6] After the sentencing in this case, the Legislature addressed juvenile sentencing concerns with new provisions of the Penal Code, effective January 1, 2014. With certain inapplicable exceptions, section 3051 now provides for parole hearings for prisoners who were under the age of 18 at the time of their offenses, during the 15th, 20th, or 25th year of incarceration (depending on the circumstances). So, at worst, Mr. Zamora will be eligible for release on parole after 25 years, when he is 42. (Court of Appeal opinions have expressed conflicting views on whether the statute satisfies the defendant's right to receive a constitutional sentence at the time of sentencing, and that and related issues are

Finally, Mr. Zamora argues his sentence violates the Eighth Amendment under general jurisprudence holding a sentence is cruel and unusual when "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) The argument is unsupportable. Mr. Zamora persists in characterizing his offenses as "assaults," with a "flawed finding by the jury of an intent to kill," and he describes his culpability as "limited to riding in a car in one incident and engaging in an unsuccessful fight in the other." These assertions do not reflect the facts found by the jury. As *Perez* observed, "[s]uccessful challenges based on the traditional [line of jurisprudence] are extremely rare." (*Perez, supra,* 214 Cal.App.4th at p. 60.) Here, as in *Perez*, the "present case certainly is not among those 'exquisitely rare' cases which merit reversal on traditional disproportionality review." (*Ibid.*) In short, Mr. Zamora has shown no disproportionality between the sentence and the crimes, and certainly none that shocks the conscience.

### 9. The Restitution Fines

When defendants committed their crimes in June 2011, section 1202.4 required the court to set a restitution fine of between $200 and $10,000, "at the discretion of the court and commensurate with the seriousness of the offense." (Former § 1202.4, subd. (b)(1), Stats. 2010, ch. 107, § 1.) The minimum fine increased to $240 starting on January 1, 2012. (§ 1202.4, subd. (b).) At the sentencing hearings held in August and November 2012, the court in each case imposed, without comment, a $240 restitution fine (and a corresponding $240 parole revocation restitution fine under section 1202.45, subdivision (a)).

A restitution fine under section 1202.4 is subject to the ex post facto clause of the Constitution. (See *People v. Souza* (2012) 54 Cal.4th 90, 143.) Defendants contend the trial court's imposition of $240 fines, instead of the $200 minimum fines, constituted an

---

pending in the Supreme Court. (See, e.g., *In re Alatriste,* review granted Feb. 19, 2014, S214652.))

unauthorized sentence and violated the ex post facto clause, because the court "attempted to impose the minimum fine . . . ." We disagree. Nowhere in the record does the trial court indicate it intended to impose the minimum fine under section 1202.4. The trial court is provided wide latitude under section 1202.4 to impose a fine between $200 to $10,000. Defendants do not argue that the trial court abused its discretion in imposing the $240 fines. They have presented no supported reason, beyond conjecture, to reduce these fines. As a result, we decline to do so.

**10. Cumulative Error**

Defendants contend the cumulative effect of the errors they allege deprived them of a fair trial, and requires reversal of the judgment, in whole or in part. They are mistaken. While "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error" (*People v. Hill* (1998) 17 Cal.4th 800, 844), that is not the case here.

In this case, the court erred only in refusing to sever Mr. Sandoval's case and admitting evidence of defendants' admission of gang membership during booking. No prejudice resulted from these errors. "A defendant is entitled to a fair trial, not a perfect one." (*People v. Mincey* (1992) 2 Cal.4th 408, 454.) We conclude defendants received a fair trial, and perceive no prejudice, cumulative or otherwise.

**DISPOSITION**

The judgments are affirmed.

GRIMES, J.

We concur:


BIGELOW, P. J.



FLIER, J.

48
